UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTICT OF MICHIGAN
SOUTHERN DIVISION

TERRI L. McCOMMONS,

                       Plaintiff,               Case No.: 10-cv-14992
                                                     Honorable Avern Cohn
      v.                                   Magistrate Judge David R. Grand

MICHAEL ASTRUE,
Commissioner of Social Security,

                       Defendant.
_____/

## REPORT AND RECOMMENDATION
## ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [18, 24]

Plaintiff Terri McCommons brings this action pursuant to 42 U.S.C. § 405(g), challenging a final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions [18, 24] which have been referred to this court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

## I.      RECOMMENDATION

For the reasons set forth below, the court finds that the Administrative Law Judge's decision rests on the application of correct legal standards and is supported by substantial evidence. Accordingly, the court recommends that the Commissioner's motion for summary judgment [24] be granted, that McCommons's motion for summary judgment [18] be denied, and that the Commissioner's findings be affirmed.

II.     **REPORT**

    A.     **Procedural History**

On September 26, 2006, McCommons filed an application for DIB, alleging disability as of September 14, 2006.  (Tr. 98-105).  Her claim was denied initially on December 21, 2006.  (Tr. 51-55).  Thereafter, McCommons filed a timely request for an administrative hearing, which was held on March 16, 2009 before ALJ Janice Bruning.  (Tr. 23-46).  McCommons, represented by attorney Alan Ben, testified, as did vocational expert ("VE") Leann Kehr.  (*Id.*).  On April 27, 2009, the ALJ found that McCommons was not disabled.  (Tr. 11-20).  On October 20, 2010, the Appeals Council denied review.  (Tr. 1-5).  Plaintiff filed for judicial review of the final decision on December 26, 2010. [1].

    B.     **Background**

       *1.     Disability Reports*

In an undated disability report, McCommons alleged that the following impairments prevented her from working:  "[n]eurological problem, complication from brain tumor, seizures, emotional problems."  (Tr. 114).  These conditions limited her ability to work due to problems with speech and manual tasks, as well as depression, making it difficult "to get up in the mornings, dress or bathe."  (*Id.*).  McCommons also reported that she "become[s] tired easily."  (*Id.*).  She reported being treated by several doctors and taking Topamax for her seizures, the side effects of which were loss of appetite and drowsiness.  (Tr. 117-120).

McCommons reported that she stopped working on her alleged onset date because she was "depressed."  (Tr. 114).  Prior to her alleged onset date, she had worked at two custodial jobs, one as a head custodian in a school for 14 years, and then as a janitor in a library for two years.  (Tr. 115).  In a field office disability report dated September 26, 2006, McCommons's

interviewer noted that she had difficulty talking, answering and understanding. (Tr. 111). The interviewer found that "[q]uestion[s] had to be repeated, rephrased for claimant to understand. Had difficulty getting words out to talk. Answers were slow and hesitant, didn't appear to understand questions at times." (*Id.*).

In a function report dated October 15, 2006, McCommons reported that she lived in a house with her fourteen-year-old son, that she typically awoke around noon, fixed breakfast and stayed home. (Tr. 139-40). She reported that she would fix her son dinner when he returned home and help him with homework. (*Id.*). Then she would go back to bed. (*Id.*). She reported difficulties with sleeping and waking, and with personal care. (Tr. 140). She reported that she would often wear dirty clothes and fail to bathe daily. (*Id.*). She needed reminders from her mother to take her medication. (Tr. 141). McCommons reported completing some household chores, but only on a weekly basis. (*Id.*). She also prepared meals, but only simple or frozen ones. (*Id.*). McCommons reported going out only when she had to, shopping for groceries twice a month and attending counseling twice a week. (Tr. 142-43).

McCommons reported that since her brain surgery in 2002, she has had difficulty talking, hearing, seeing, completing tasks, concentrating, remembering, understanding, following instructions and getting along with others. (Tr. 144). McCommons reported that she could pay attention for only 20 minutes at a time, and that she needed to have verbal instructions repeated, and needed to read written instructions more than once because she had difficulty retaining things. (*Id.*). She reported having trouble controlling herself with "mean bosses" and not being able to handle stress or changes in her work routine. (Tr. 145).

In an undated disability appeals report, McCommons reported that her condition had worsened and she was "fatigued." (Tr. 159). She reported taking Depakote and Paroxetine, in

3

addition to her Topamax, but claimed that both made her tired.  (Tr. 161).

### 2.    *Plaintiff's Testimony*

McCommons underwent surgery to remove a benign brain tumor in 2002.  (Tr. 299-301).

At the hearing, she testified that she was divorced, and living with her then-16-year-old son.  (Tr.

26).  When asked how tall she was, she initially said 4'11", but then testified "on the height, I'm

not sure on the height, I don't know, Well I want to say 4'2"."  (*Id.*).  McCommons testified that

she received two years of college education in addition to high school.  (Tr. 27).  She testified

that she had a history of seizures with the last one being sometime in 2004 and that she took

medication for her seizures which made her drowsy.  (Tr. 28).  She testified she was also

diagnosed with depression and anxiety.  (Tr. 29).

McCommons testified that her conditions led to crying spells, difficulty thinking and

concentrating, paranoid thoughts and panic attacks.  (Tr. 30).  She also had recently begun

hearing strange voices or sounds and smelling strange odors.  (Tr. 38).  When asked about

difficulty concentrating, McCommons began to answer, but then asked for the question to be

repeated.  (Tr. 39).  She finally answered that she could not "copy" or "remember things very

clearly."  (*Id.*).  She testified that she attended group meetings once a month and met with her

therapist, Andrea Thomas weekly.  (Tr. 29; 181).  She also met with her neurologist, Dr. Barkley

"as scheduled."  (Tr. 29; 471).  She was no longer permitted to drive so she attended her

appointments, alone, via public transit.  (Tr. 33).

McCommons testified that her day would consist of waking up, turning on the TV and

then waking her son up for school at 6:30 and going back to bed.  (Tr. 35).  She testified that she

watched soap operas.  (Tr. 34).  She also testified that she had purchased a computer in the

preceding five months, but had only used it twice.  (Tr. 35).  When her son returned home, he

would make something to eat, and she would still be in bed.  (*Id.*).  McCommons testified that she did not sleep well at night and thus would nap in the afternoon.  (Tr. 31-32).  When asked about her personal care, she testified that she had to force herself to take showers.  (Tr. 32).  McCommons testified that her son did the majority of the cooking, cleaning and shopping, despite the fact that he was still in school.  (Tr. 32-33).  She testified that the family had a dog but that her son cared for it.  (Tr. 34-35).  McCommons testified that she had no hobbies or interests, and that she would only leave the house to go to church and doctor appointments.  (Tr. 34, 38).  McCommons testified that she stopped working due to problems getting along with her co-workers and anger issues, what she characterized as "uncontrollable habits."  (Tr. 40).

3.    *Medical Evidence*

a.    *Treating Sources*

On October 11, 2002, McCommons underwent surgery to remove what was ultimately diagnosed as a benign brain tumor on her left temporal lobe.  (Tr. 306-312).  She was initially put on Dilantin to prevent seizures, and in approximately March 2003, after an attempt to wean her off the Dilantin, she experienced a seizure.  (Tr. 256; 258; 262).  Later, Topamax was added to her regimen to assist in weaning her off Dilantin.  (Tr. 220).  In March 2004, because she was not taking the correct dosage of Topamax, McCommons experienced another seizure, which was accompanied by a fall and a laceration to her head which required surgical repair.  (Tr. 208-209).  Several times McCommons reported to her primary care physician, Dr. Emmanuel Dizon, that the Topamax made her tired.  (Tr. 330; 335; *see also*  327 (reporting tiredness but does not specifically mentioning Topamax as a cause)).

On September 13, 2006, McCommons reported to Dr. Dizon that she had an altercation at work with a security guard and she was distraught, concerned that she would be fired.  (Tr. 337).

She asked Dr. Dizon whether she could take a leave of absence because of the situation.  (*Id.*).

Dr. Dizon noted that "given her history, she does have a history [of] depression and maybe some

anxiety component as well as [a] history of seizures.  I would want her to avoid [a] stressful

situation, so I did write a letter to that effect."  (*Id.*).  Dr. Dizon wrote McCommons a work note

stating that, because of her medical condition, she should not be placed in emotionally stressful

situations.  (Tr. 201).  On February 2, 2009, Dr. Dizon wrote a "To Whom It May Concern"

letter, noting that McCommons had been dealing with depression and anxiety since her brain

tumor removal in 2002 and that she has sought the services of a psychiatrist, a group therapist

and a neurologist, all of which had "limited success" according to Dr. Dizon.  (Tr. 431).  He

stated that "she would have emotional difficulty dealing with co-workers and employers" and

that "[h]er depression and anxiety impairs her ability to concentrate and focus on a subject for

more than a certain period of time."  (*Id.*).

On September 21, 2006, McCommons saw Dr. Augusto Jamora for a psychiatric consult.

(Tr. 341).  She informed Dr. Jamora that she wanted "to get a letter because she didn't feel that

she could go back to work…"  (*Id.*)  She blamed her condition and returning to work too soon for

the problems she was having in her job.  (*Id.*).  She complained of depression, lack of sleep,

tiredness, decreased appetite and poor concentration.  (*Id.*).  Upon examination, Dr. Jamora noted

McCommons was uncooperative, guarded and suspicious; that she was depressed, anxious and

angry, with impaired judgment and suicidal ideation, but with no plan.  (Tr. 342).  However, he

did not note any concentration problems and noted that McCommons denied any memory

problems.  (*Id.*).  He further noted that McCommons's thought processes were "logical/coherent,"

and that she had no perceptual disturbance.  (*Id.*).  Dr. Jamora did not administer a "mini mental

state exam."  (*Id.*)  Dr. Jamora found that she had only a "Low Suicide Risk," related to an

"anxiety disorder" that he rated as "Not Moderate/Severe."  (*Id.*).

Dr. Jamora's impressions were that McCommons's problems could either be organic in nature or psychiatric, and he recommended she stay off work until he could order a neurology consultation and neurological testing.  (Tr. 343).  He wrote her a work note to that effect.  (Tr. 200).  However, he also stated that "[a]nother alternative may be to transfer her to a different library even while she is being worked up."  (*Id.*; Tr. 343).  He diagnosed her with a mood disorder not otherwise specified ("NOS"), a psychotic disorder NOS, and issued her a Global Assessment of Functioning ("GAF")[1] score of 50.  (Tr. 343).  He prescribed her Depakote and paroxetine, but McCommons refused them.  (*Id.*).  Dr. Jamora noted that McCommons stated that she had "wasted her time coming here since she couldn't get what she needed."  (*Id.*).  Dr. Jamora observed that McCommons "seemed to get worse the longer I saw her."  (*Id.*).

On December 12, 2006, Dr. Jamora saw McCommons again, and issued a "To Whom It May Concern" letter.  (Tr. 382).  While Dr. Jamora's letter made brief reference to a significant mood fluctuation, he noted that "today she was controlled, reasonable and patient."  (*Id.*).  He also noted that "[t]o date, she has not really had a trial of medications" because she was not taking the medicines as prescribed.  (*Id.*).  Dr. Jamora's letter contains no diagnosis, yet he concluded that it was his "impression that [McCommons] is not capable of returning to work as of December 17, 2006," and he "recommend[ed] that she consider applying for a disability or medical retirement."  (*Id.*).

At an appointment on January 11, 2007 with Dr. Jamora, McCommons reported continuing to get more and more depressed.  (Tr. 439).  She also reported having periods of

---

[1] The Global Assessment of Functioning, or "GAF", represents "the clinicians' judgment of the individual's overall level of functioning.  *DSM-IVTR* at 32 (July 2000).  A GAF score of 50 represents "serious symptoms" including suicidal ideation, or any serious impairment in social, occupational or school functioning.  *Id.* at 34.

confusion coupled with an inability to talk. (*Id.*). Upon examination, Dr. Jamora noted that McCommons was well groomed and cooperative, that she exhibited no concentration problems, and that she denied any memory problems. (*Id.*). He found her judgment marginal and her insight poor, and he noted her Depakote levels were low which indicated noncompliance with her medication. (*Id.*). He also noted that McCommons "had an EEG done that showed no epileptiform activity – normal EEG." (*Id.*).

On February 11, 2009, McCommons attended an appointment with the neurologist Dr. Barkley. (Tr. 471-73). Despite the notation in his records that this was a follow-up appointment, there are no other records in the file regarding any prior treatment of McCommons. (Tr. 471). At the appointment, McCommons reported having seizure-like episodes once every two months and feeling tired all the time. (*Id.*). He noted that she wakes up daily at 5 a.m. and is severely stressed by her inability to work. She reported trying to go back to work after her 2004 seizure and head injury, but was "taken off the job by orders of the therapists." (*Id.*). McCommons reported mood swings, crying spells, and suicidal thoughts. (*Id.*). She complained about the status of her disability application. (*Id.*). Upon examination, Dr. Barkley noted that McCommons was alert and oriented with good concentration and unchanged recent and remote memory function. (Tr. 473). He determined that she needed a change in her anti-seizure medication and that he would start her on another one while weaning her off Topamax. (*Id.*). He diagnosed her with severe post-traumatic stress disorder (related to various events not relevant here) and depression. (*Id.*).

On March 2, 2009, McCommons's therapist, Andrea Thomas, completed an assessment of McCommons for the Michigan Disability Determination Service. (Tr. 181-86). She noted that McCommons suffered from major depression with suicidal ideation and attention deficits

likely related to the depression. (Tr. 181). Thomas stated that McCommons's daily activities depended on her level of depression and that there were times she felt unable to leave the house and felt uncomfortable around large crowds. (Tr. 183). However, Thomas also noted that McCommons always arrived at her therapy appointments alone and on time, and was dressed "neatly and appropriately." (*Id.*). Thomas found McCommons needed "no assistance with basic self-care skills," and that "[f]or the most part, McCommons has adequate contact with reality." (*Id.*). She noted that McCommons had some word-finding difficulty, marginal insight and occasional lost train of thought. (Tr. 184). She reported that McCommons usually presented at therapy with a depressed mood and affect with some anger and a certain level of paranoia. (Tr. 185). Upon examination, Thomas noted that McCommons could repeat four numbers forward and three numbers backwards and remember one out of three objects after a three minute delay. (*Id.*). She was able to name four presidents, five large cities, one celebrity and four current events. (*Id.*). She could fairly explain two idioms, could compare and contrast a bush and a tree, and was able to articulate some future plans. (Tr. 185-86). Thomas diagnosed McCommons with major depressive disorder (recurrent), and post-traumatic stress disorder. (Tr. 186). Her prognosis for McCommons was "guarded." (*Id.*). She noted on the form that she began treating McCommons in June 2008 and her last appointment was February 24, 2009. (*Id.*). In a March 5, 2009 addendum requested by McCommons's attorney, Thomas stated that McCommons "clearly has psychological problems which impact her ability to function in the workplace," and that "[h]er mood disorder also compromises her ability to concentrate and maintain attention needed to carry out simple and/or repetitive tasks for more than an hour." (Tr. 478). She found that McCommons "would be unable to perform activities within a schedule and maintain punctuality and attendance within expected time frames." (*Id.*).

9

b.      *Consultative and Non-Examining Sources*

On December 2, 2006, Dr. Raghuram Matta, M.D., conducted a physical examination of McCommons for the State of Michigan.  (Tr. 393-98).  Dr. Matta noted that an MRI done on McCommons's brain in 2004 showed postoperative changes in the area where her tumor was removed compatible with a softening of the brain from the removal of the tumor.  (Tr. 393).  McCommons reported having weekly episodes of being unable to talk, associated with momentary confusion, despite the fact that she was compliant with her Topamax and her last grand mal seizure was in 2004.  (*Id.*).  Dr. Matta noted a physical exam that was unremarkable in all respects and issued McCommons no physical limitations.  (Tr. 397-98).

On December 2, 2006, Dr. Atul Shah, M.D. examined McCommons for the State of Michigan.  (Tr. 385-87).  At the appointment, McCommons reported low self-esteem and depression that had existed since her teenage years, but that became worse after her 2002 brain surgery.  (Tr. 385).  McCommons reported difficulty concentrating and difficulties with her short- and long-term memory.  (*Id.*).  She reported paranoid thoughts that people were following her, as well as hearing noises such as bells ringing or someone inside her house.  (Tr. 385-86).  In addition, she reported mood swings and anxiety, though Dr. Shah did not observe either during the interview.  (Tr. 385).

McCommons reported that her daily activities consisted of watching television, rarely shopping, never doing chores, and driving only when necessary.  (Tr. 386).  Dr. Shah documented a depressed, anxious and fearful emotional state, with a blunt affect.  (*Id.*).  He noted she recalled only 2 out of 5, 1 out of 5 and 1 out of 3 objects in a recent memory test, and could name only two past presidents, one large city and no famous people.  (*Id.*).  She stated that she could not add 5 and 4 together, and she multiplied 6 times 7 incorrectly.  She stated that she

10

could not explain two idioms, or the difference between a bush and a tree.  (Tr. 387).  Dr. Shah diagnosed McCommons with major depressive disorder, recurrent with psychotic features in partial remission.  (*Id.*).  He assessed her a GAF score of 40,[2] found her unable to manage any benefit funds she might receive, but concluded that her prognosis was "fair."  (*Id.*).

On December 13, 2006, Dr. Donald Tate, Ph.D. issued a mental RFC assessment for McCommons.  (Tr. 402- 415; 424-27).  He assessed her under listings 12.02 (Organic Mental Disorders) and 12.04 (Affective Disorders).  (Tr. 402).  Under listing 12.02, Dr. Tate diagnosed McCommons with a cognitive disorder not otherwise specified.  (Tr. 403).  Under listing 12.04, he diagnosed her with major depressive disorder with psychotic features in partial remission.  (Tr. 405).  He documented moderate limitations in McCommons's ability to maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, and to be punctual with customary tolerances.  (Tr. 424).  He also found her moderately limited in her ability to complete a normal work-day and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number of rest periods.  (Tr. 425).  Finally, Dr. Tate found her moderately limited in her ability to set realistic goals or make plans independently of others.  (*Id.*).  He then assessed McCommons with mild restrictions of activities of daily living, mild difficulties in maintaining social functioning and moderate difficulties in maintaining concentration, persistence and pace ("CPP").  (Tr. 412).  He found no episodes of decompensation of extended duration.  (*Id.*).  He concluded she could "do simple tasks."  (Tr. 414).

On December 18, 2006, examiner Dr. William Joh, M.D. assessed McCommons's

---

[2] A GAF score of 31-40 indicates some impairment in reality testing or communication or a major impairment in several areas, such as work or school, family relations, judgment, thinking or mood.  *See* DSM-IV-TR, at 34 (July 2000).

physical RFC for the State of Michigan. (Tr. 416-23). He found no exertional limitations and only one non-exertional limitation: the avoidance of concentrated exposure to hazards. (Tr. 420).

On July 23, 2007, Dr. Larry Berkower, M.D. examined McCommons at the request of her attorney. (Tr. 433-38). McCommons's reports to Dr. Berkower were consistent with her reports to other treating and consulting doctors, namely depression with crying spells, inability to concentrate, paranoid thoughts, difficulty getting along with others, irritability and tiredness. She also reported eating excessively and gaining 20 pounds, and needing to be reminded to bathe. (Tr. 433-35).[3] Upon examination, Dr. Berkower found that McCommons spoke slowly and hesitantly and cried often during the interview. (Tr. 436). He noticed some psychomotor slowing, with "loose-jointed" associations. (*Id.*). He diagnosed her with major depressive disorder, single episode, manifested by "her withdrawn and minimally functioning behavior pattern, recurrent crying spells, loss of decision-making capability . . . persistent exhaustion and fatigue, very impaired concentration, a significant gain of weight along with her general demoralization and discouragement." (*Id.*). He assessed her a GAF score of 30 "reflective of major impairments in all areas of her life," and concluded she was incapable of resuming any substantial gainful employment "now or in the foreseeable future." (Tr. 437).

On February 26, 2007, McCommons underwent a neuropsychological assessment by Dr. Janet Reed, Ph.D., at the request of her treating neurologist, Dr. Barkley. (Tr. 442-47). Dr. Reed noted that McCommons reported depression and problems with "not really knowing to remember" since her surgery. (Tr. 442). However, McCommons reported that she was "generally not depressed" and that on the date of the appointment her depression, on a scale of 1

---

[3] Despite the fact that Dr. Berkower documented McCommons as having "gained 20 pounds," other medical records belie that claim, or suggest her weight gain was temporary: McCommons weighed 202 pounds in November 2004, 200 pounds in January 2005, 199 pounds in April 2007, and 191 pounds in March 2009. (Tr. 208, 211, 454, 473).

to 10 was a "1." (Tr. 444). McCommons denied any problems with sleep or appetite. (*Id.*). She reported her typical day involved waking her son for school, cleaning, attending therapy and "then spending much of the day making phone calls and finding resources for herself and her son" through the local library or other community resources (*Id.*). She also reported helping her mother and taking her to doctor appointments, attending dollar movies or watching free video rentals. (*Id.*). Though McCommons reported word-finding problems, Dr. Reed observed no such problems during the session. (*Id.*).

Upon observation, Dr. Reed noted that McCommons was oriented to person and place but not time, that her attention span and focus were within normal limits, and that her persistence to complete tasks was adequate. (Tr. 444). She observed that McCommons appeared to put forth less than full effort on the tests and "demonstrated an overly exaggerated and negativistic style of responding on a symptom checklist," leading her to suggest interpreting the test results with caution. (*Id.*). McCommons's test results were, for the most part, consistent with her status post-surgery. (Tr. 444-445). However, while she exhibited some memory problems, Dr. Reed noted that her test results showed greater impairment than those individuals with dementia or traumatic brain injury, and thus poor effort could not be ruled out as a factor. (Tr. 445).

Dr. Reed also noted mild to moderate deficits in McCommons's speed of processing and mental set shifting. (*Id.*). Dr. Reed diagnosed her with neoplasm, brain (status post left temporal meningioma resection) and major depressive disorder and concluded that her "current level of functioning represents significant impairment in her occupational functioning, associated with conflict and poor understanding of work-related expectations." (*Id.*). At an appointment on May 4, 2007, Dr. Reed reviewed McCommons's test results with her. (Tr. 456-57). During the appointment, McCommons had asked Dr. Reed to review the report of a Dr. Frank, which was

13

related to an evaluation of her disability claim.  (Tr. 456).  Dr. Reed reported that "McCommons reviewed the report and wanted to make the correction that she [was] not let go from her position; rather she was on leave at the present time."  (Tr. 457).

### 4.    *Vocational Expert's Testimony*

Leann Kehr, the VE, testified that McCommons's prior relevant work was janitorial, requiring medium to heavy exertion and was unskilled in nature.  (Tr. 41).  The ALJ then posed a hypothetical that included a person of McCommons's age, education and work experience, who needed to avoid concentrated exposure to work hazards and hazardous machinery and heights, and who could only have occasional contact with the public, co-workers and supervisors.  (Tr. 41-42).  The VE testified that such a person could perform McCommons's prior relevant work as a janitor as generally performed.  (*Id.*).  The ALJ then added the requirement of needing only one to two step tasks.  (Tr. 42).  The VE testified that this requirement would move the job category from janitorial over to manufacturing and stated that jobs existed, including assembly and packaging, that satisfied this requirement.  (Tr. 42-43).  The VE testified that such jobs would only allow one absence a month.  (Tr. 43).

When the ALJ asked whether or not a hypothetical claimant could be off task for fifteen percent of the time, the VE testified that, in a manufacturing setting, a claimant must be on-task 90 percent of the time in order to sustain the pace.  (*Id.*).  The ALJ then asked about the impact on her answer if the hypothetical claimant could not perform repetitive tasks for more than an hour.  (Tr. 44-45).  The VE testified that this would preclude the types of jobs previously identified. (Tr. 45).

### C.    **Framework for Disability Determinations**

Under the Act, DIB is available only for those who have a "disability."  *See Colvin v.*

14

*Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability" in relevant part as the:

> inability to engage in any substantial gainful activity by reason of any
> medically determinable physical or mental impairment which can be
> expected to result in death or which has lasted or can be expected to last
> for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

The Commissioner's regulations provide that a disability is to be determined through the

application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful
> activity, benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or
> combination of impairments that "significantly limits . . . physical or
> mental ability to do basic work activities," benefits are denied without
> further analysis.
>
> Step Three:  If the claimant is not performing substantial gainful activity,
> has a severe impairment that is expected to last for at least twelve months,
> and the severe impairment meets or equals one of the impairments listed in
> the regulations, the claimant is conclusively presumed to be disabled
> regardless of age, education, or work experience.
>
> Step Four:  If the claimant is able to perform his or her past relevant work,
> benefits are denied without further analysis.
>
> Step Five:  Even if claimant is unable to perform his or her past relevant
> work, if other work exists in the national economy that plaintiff can
> perform, in view of his or her age, education, and work experience,
> benefits are denied.

*Schueunieman v. Comm'r of Soc. Sec.*, No. 11-10593, 2011 U.S. Dist. LEXIS 150240 at *21

(E.D. Mich. Dec. 6, 2011) *citing* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of*

*Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).  "The burden of proof is on the claimant throughout

the first four steps . . . .  If the analysis reaches the fifth step without a finding that claimant is

not disabled, the burden transfers to the [defendant]."  *Preslar v. Sec'y of Health & Human*

*Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### D.     The ALJ's Findings

Following the five-step format, the ALJ determined that McCommons was not disabled because she was capable of performing her past relevant work as a janitor.  (Tr. 20).  At Step One, the ALJ found that McCommons had not engaged in substantial gainful employment since her alleged onset date.  (Tr. 16).  At Step Two, she determined that McCommons had the following severe impairments:  "seizure disorder [status post left hemisphere meningioma tumor resection - 10/02]; cognitive disorder NOS; and major depressive disorder."  (Tr. 16).  At Step Three, the ALJ held that McCommons's impairments, alone or in combination, did not meet or medically equal a listed impairment.  (Tr. 17).  She found that McCommons had mild restrictions of activities of daily living, and moderate difficulties in social functioning and in CPP.  (*Id.*).  She found no episodes of decompensation of extended duration.  (*Id.*).  The ALJ next assessed McCommons's RFC, finding her capable of performing work at all exertional levels with the following nonexertional limitations:  "avoid concentrated exposure to work hazards (height or machinery) due to her past history of seizures; and routine unskilled work because of moderate deficiency in concentration, persistence and pace."  (Tr. 18).  At Step Four, the ALJ determined that McCommons's RFC assessment was consistent with her prior relevant work as a janitor, based on VE testimony at the hearing.  (Tr. 20).  The ALJ concluded that McCommons could return to her prior relevant work and thus was not disabled under the Act.  (*Id.*).

### E.     Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact

unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted). In deciding whether substantial evidence supports the ALJ's decision, the Court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings for substantial evidence, the Court is limited to an examination of the record and must consider the record as a whole. *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ. *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted). If the Commissioner's decision is

17

supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted).

## F.    Analysis

McCommons alleges several errors by the ALJ.  First, she argues that the ALJ erred in not considering her obesity when making the determination that her conditions did not meet or equal a listed impairment.  Second, she argues that the ALJ erred in her RFC assessment because she improperly dismissed the opinions of McCommons's treating and examining physicians and her therapist, and failed to account for the side effects of McCommons's medications on her ability to work.  Finally, McCommons argues that the ALJ failed to pose hypotheticals to the VE that adequately accounted for her moderate difficulties in CPP.[4]

### 1.    Obesity and a Listed Impairment

McCommons first argues that the ALJ failed to consider her alleged obesity when determining whether her conditions met or medically equaled a listed impairment.  She argues that had her obesity been considered, she would have met the requirements for listing 12.02.

Social Security Ruling 02-01p lays out the Social Security Administration's policy on evaluating obesity.  It states that, because obesity "may cause or contribute to," among other things "mental impairments such as depression," it should be taken into account when determining the effects of impairments on a claimant's ability to work, or whether or not a

---

[4]  McCommons also included in her argument heading that she took issue with the ALJ's credibility determination.  However, beyond that statement, McCommons did nothing more to develop that argument and thus the court need not address it.  *See McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").  At any rate, ample evidence supports the ALJ's determination.  *See supra* at 12-13.

claimant's impairment or combination of impairments meets a listed impairment.  *SSR 02-01p*,

2002 SSR LEXIS 1 at *2-3, *6-7, 2000 WL 628049 (Sept. 12, 2002).  However, as the Sixth

Circuit noted in *Reynolds v. Comm'r of Soc. Sec*., 424 Fed. Appx. 411, 416 (6th Cir. 2011),

obesity can only be considered where it is actually raised by the claimant in the first place.  Here,

just as in *Reynolds*, McCommons "did not put her obesity at issue in the proceedings below: she

did not list obesity as one of her impairments, or list it is one of her difficulties on any paperwork

put before the various levels of review."  *Id.*  Because she failed to raise the issue of obesity at

any time before appealing to this court, she waived it.  *See, e.g.*, *Motin v. Comm'r of Soc. Sec.*,

2010 WL 1754821, at *3 (E.D. Mich. April 30, 2010) (ruling that claimant waived alleged

illiteracy disability by not raising it in her benefits application or at the hearing before the ALJ)

(citing *Anderson v. Barnhart*, 344 F.3d 809, 814 (8th Cir.2003) ("[Claimant] never alleged any

limitation in function as a result of his obesity in his application for benefits or during the

hearing.  Accordingly, this claim was waived from being raised on appeal.") and *Meanel v.

Apfel*, 172 F.3d 1111, 1115 (9th Cir.1999) ("when claimants are represented by counsel, they

must raise all issues and evidence at their administrative hearings in order to preserve them on

appeal.")); s*ee also Pena v. Charter*, 76 F.3d 906, 909 (8th Cir. 1996) (claimant who fails to list

alleged disabling condition in application for benefits, or testify to condition at administrative

hearing, waives ability to raise issue on appeal, regardless of whether evidence exists in the

record to support claim).

        Moreover, the fact that none of McCommons's physicians, treating or consulting ever

"described her as obese, much less gave an opinion that her weight imposed additional

limitations upon her or exacerbated her other conditions," demonstrates that there is not

sufficient evidence to consider such a claim.  *Reynolds*, 424 Fed. Appx. at 416.  The only

physician to even mention McCommons's weight was Dr. Berkower, and he only did so by noting that she had reported eating excessively and gaining twenty pounds. (Tr. 434). He did not find her obese or assess any specific limitations based upon her weight. (Tr. 433-38). Finally, as noted in footnote 3, *supra*, her report of a quick twenty pound gain is belied by other evidence in the record showing that her weight was generally consistent throughout the time period in question. Thus, the ALJ did not err in not considering McCommons's alleged obesity.

### 2. The ALJ's RFC Assessment and Weight Given to Treating Physicians

McCommons next argues that the ALJ's RFC assessment was flawed because it failed to properly account for the opinions of her treating physicians and her therapist. In addition, she argues that the ALJ failed to account for the side effects of her medication in the RFC assessment. The court finds no errors mandating remand with respect to any of those issues.

### a. Drs. Dizon and Berkower

An ALJ must give a treating physician's opinion controlling weight where it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is "not inconsistent with the other substantial evidence in the case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) *quoting* 20 C.F.R. § 404.1527(d)(2). If an ALJ declines to give a treating physician's opinion controlling weight, she must then determine how much weight to give the opinion, "by considering a number of factors, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician." *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) *citing Wilson*, 378 F.3d at 544; *see also* 20 C.F.R. § 404.1527(d)(2). The ALJ must give good reasons, supported by substantial evidence in the record, for the ultimate

weight given to a treating source opinion. *Id.*, citing *Soc. Sec. Rul*. 96-2p, 1996 SSR LEXIS 9 at *12, 1996 WL 374188 at *5. An ALJ is not required to give any special weight to a treating source's conclusion that a claimant is disabled, as this conclusion is reserved to the Commissioner alone, based on all the evidence of record. 20 C.F. R. § 404.1527(e)(1), (e)(3).

Here, the ALJ gave good reasons for not affording Dr. Dizon's opinions great weight. The ALJ noted that Dr. Dizon's opinions were based exclusively on McCommons's subjective complaints, and not on objective medical evidence or testing. (Tr. 19). Furthermore, the ALJ found that Dr. Dizon's opinions, that McCommons had difficulty being around others, conflicted with other substantial evidence in the record, namely McCommons's daily activities, which include using public transportation and going church regularly. (*Id.*). In addition, Dr. Dizon is not a mental health specialist, and his opinion was rendered approximately two-and-a-half years after his last treating notes in the record. (Tr. 431). Therefore, the court finds the ALJ did not err in giving his opinions little or no weight.

Similarly, the ALJ gave good reasons for rejecting Dr. Berkower's opinion. She noted that Dr. Berkower was not a treating physician, and concluded that he lacked sufficient contact with McCommons to draw a longitudinal picture of her condition. (Tr. 19); 20 C.F.R. § 404.1527(d)(2). The ALJ also found that his report was based wholly on McCommons's subjective statements. (*Id.*). Indeed, Dr. Berkower conducted no objective medical tests, and his examination of McCommons was perfunctory at best. (Tr. 436-37). As the ALJ stated, she disregarded opinions that were unsupported by medical tests and were in conflict with other evidence. (Tr. 19). Therefore, the court finds that good reasons support the ALJ's rejection of Dr. Berkower's opinion.

b.      *Dr. Jamora*

The ALJ did not err in giving "little to no weight" to Dr. Jamora's September 2006 and December 2006 opinions.  The ALJ rejected the September 2006 opinion (Tr. 341-43) because she found it was based on subjective complaints only, and was inconsistent with McCommons's daily activities.  (Tr. 19).  Those findings are supported by the record, and the weight given was appropriate considering the opinion's notation that McCommons did not exhibit any concentration problems or perceptual disturbances, and that her thought processes were "logical/coherent," among other findings, and that an "alternative [to waiting for neurological testing before returning to work] may be to transfer her to a different library even while she is being worked up."  (Tr. 342-43).

With respect to Dr. Jamora's December 2006 opinion (Tr. 382), the ALJ indicated that she was giving it "little or no weight…since he does not appear to be a treating source at that time."  (Tr. 19).  While her rationale appears to be erroneous – Dr. Jamora was, in fact, treating her around the December 2006 timeframe, *see* Tr. 382 (indicating that Dr. Jamora saw McCommons that day), 439 (January 2007 treatment note) – that error does not require remand.

Reversal and remand is generally appropriate when the ALJ fails to give good reasons for discounting a treating physician's opinions, even if "substantial evidence otherwise supports the decision of the Commissioner."  *Wilson*, 378 F.3d at 543-46 (6th Cir.2004).  This is because a "failure to follow the procedural requirement 'of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight accorded the opinions denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record.'"  *Friend v. Comm'r of Social Security*, 375 Fed. Appx. 543, 551 (6th Cir. 2010) (quoting *Rogers v. Comm'r of Social Security*, 486 F.3d 234, 243 (6th Cir. 2007);

*see also Wilson* at 546 (a reviewing court "cannot excuse the denial of a mandatory procedural protection simply because ... there is sufficient evidence in the record of the ALJ to discount the treating source's opinion and, thus, a different outcome on remand is unlikely").  However, as explained in *Friend*, certain exceptions exist where a violation of the general rule constitutes "harmless error" not warranting remand, including:

> (1) if "a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it"; (2) "if the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion"; or (3) "where the Commissioner has met the goal of § 1527(d)(2)-the provision of the procedural safeguard of reasons-even though she has not complied with the terms of the regulation."  In the last of these circumstances, the procedural protections at the heart of the rule may be met when the "supportability" of a doctor's opinion, or its consistency with other evidence in the record, is indirectly attacked via an ALJ's analysis of a physician's other opinions or his analysis of the claimant's ailments.  Thus the procedural rule is not a procrustean bed, requiring an arbitrary conformity at all times.  If the ALJ's opinion permits the claimant and a reviewing court a clear understanding of the reasons for the weight given a treating physician's opinion, strict compliance with the rule may sometimes be excused.

*Friend*, 375 Fed. Appx. at 551 (internal citations omitted).

Here, the first and third exceptions are applicable.  Dr. Jamora's December 2006 letter is patently deficient because it contains no diagnosis whatsoever, appears to be based on McCommons's self-reports, not medical evidence, and amounts to nothing more than the conclusory opinion that McCommons was unable to work (and then, only "as of December 17, 2006") – an opinion not entitled to controlling weight because it was regarding an "issue[] reserved to the Commissioner."  (Tr. 382); 20 C.F.R. § 404.1527(e).  *See also Gay v. Astrue*, 2012 WL 602364, at *11 (E.D. Mich. Jan. 5, 2012) (declining, under *Wilson* and *Friend*, to remand where unconsidered treating opinion was not supported by medical evidence).  Dr. Jamora's opinion also seems at odds with his same-day finding that McCommons "was

controlled, reasonable and patient." (*Id.*).   The third exception also applies because, as noted above, the ALJ had good reason for giving little or no weight to Dr. Jamora's September 2006 opinion.   Since the December 2006 opinion did not appear to be based on any intervening medical evidence, the "procedural safeguard of reasons" applicable to Dr. Jamora's first opinion suffices for the second one, issued just three months later.   *Friend*, 375 Fed. Appx. at 551.

c.   *Therapist Thomas*

McCommons argues that the ALJ erred by not expressly "mention[ing] the opinion of Andrea Thomas in her decision, thus, her opinions are obviously not even analyzed."   Pl. Motion at 17.   Although she is correct that the ALJ's decision does not expressly mention Thomas's opinion, it does not follow that it went unconsidered, or that remand is required.   SSR 06-3p relates to the weight an ALJ may give to "Other Evidence from Sources Who Are Not 'Acceptable Medical Sources,'" including limited license therapists like Ms. Thomas, whose opinions are not entitled to controlling weight.   *See* 20 C.F.R. §§ 404.1513(a), 416.913(a); SSR 06-3p.   The relevant Ruling provides that the ALJ "generally should explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case."   *SSR 06-03p*, 2006 WL 2329939 at *6 (Aug. 6, 2006).   In *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532 (6th Cir. 2007), the Sixth Circuit found that the ALJ committed error (though not reversible error for reasons not at issue here) by not discussing the reports of chiropractors who were "other sources" under Ruling 06-3p:

> We have previously held that an ALJ has discretion to determine the proper weight to accord opinions from "other sources" such as nurse practitioners. However…[Ruling 06-3p] … clarifies how the Commissioner is to consider opinions and other evidence from sources who are not "acceptable

24

> medical sources." While the ruling notes that information from "other sources" cannot establish the existence of a medically determinable impairment, the information "may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function."

*Id.* at 541. Thus, although there is no requirement that the ALJ must expressly discuss every piece of record evidence, *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. App'x 496, 508 (6th Cir. 2006) ("[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party"); *Van Der Maas v. Comm'r of Soc. Sec.*, 198 Fed. App'x 521, 526 (6th Cir. 2006), the court finds that the ALJ should have discussed Thomas's findings and opinions.

Remand, however, is not required here because the ALJ's decision provides a sufficiently detailed analysis (Tr. 16-20) to allow the reader to follow her decision, and to know that remand to consider Thomas's opinions would be an exercise in futility. *See Miller v. Comm'r of Social Security*, 2009 WL 997312, at *3 (E.D. Mich. Apr. 14, 2009) (declining remand despite finding that ALJ should have discussed chiropractors' opinions, where such remand would not "have made any difference"). The ALJ's detailed analysis of McCommons's credibility, the severity of her impairments based on the medical evidence, and her residual functional capacity were all at odds with Thomas's findings. (*Cf.* Tr. 16-20 with Tr. 181-186). Moreover, the Michigan Disability Determination Service form on which Thomas provided her opinions emphasizes the requirement that the opinions "must be supported by objective clinical data." (Tr. 181). However, Thomas's report relied predominantly on McCommons's own subjective statements. Thomas's "addendum" (Tr. 478) was simply a conclusory follow-up to her prior opinions, also lacking in any objective clinical data. Finally, Thomas's opinions are internally inconsistent, and of limited value regarding the one thing they could be considered for – the severity of her

impairment.  *Cruse*, 502 F.3d at 541.[5]  Thomas stated that McCommons was able to get to her weekly appointments alone and on time, and that she was always polite and dressed "neatly and appropriately," and that she "always related well to [Thomas and clinic staff]."  (Tr. 182-83). Thomas also noted that McCommons "requires no assistance with basic self care skills," and that "[f]or the most part, McCommons has adequate contact with reality."  (Tr. 183).  Accordingly, based on the ALJ's detailed analyses concluding that similar factors supported her other findings (*e.g.*, Tr. 17 (noting McCommons "had no apparent problems interacting with" doctors), Tr. 17, 19 (noting McCommons use of public transportation, driving and performing daily chores)), it is clear that that her error in not expressly referencing Thomas's report was harmless.  *Miller*, 2009 WL at *3.

### d.      The Effects of McCommons's Medications

McCommons next argues that the ALJ failed to account for the side effects of her medication, specifically the Topamax, which causes drowsiness.  Evaluation of McCommons's symptoms under the regulations requires consideration of all subjective complaints, including, but not limited to type, dosage, effectiveness and adverse side effect of any medication taken to alleviate symptoms.  *See* 20 C.F.R. § 404.1529(c)(3)(iv).  However, unlike some of the other regulations, this regulation does not require the ALJ to explain her consideration of this factor in her written decision.  *Id.*; *see also Hale v. Comm'r of Soc. Sec.*, no. 10-10751, 2011 U.S. Dist. LEXIS 46865 at *8, 2011 WL 1641892 (E.D. Mich. May 2, 2011).

Here, the court finds that the ALJ properly considered the side effects of McCommons's medications.  In response to the ALJ's question on the topic, McCommons testified that a side effect of her Topamax was drowsiness.  (Tr. 28).  She also reported such a side effect in her

---

[5] "Other sources," such as Ms. Thomas, "cannot establish the existence of a medically determinable impairment."  *Id.*

disability reports, and there is evidence that she reported to her doctors that she believed Topamax made her drowsy. (Tr. 117-120; 327; 330; 335; 341). The ALJ stated in her opinion that she did not find McCommons's testimony or subjective reports credible to the extent they conflicted with the RFC assessment. (Tr. 18-19). In addition, while Dr. Barkley noted that Topamax produced drowsiness in McCommons "at a dose of 100 mg per day," he had limited her dose to 75 mg per day and recommended she take it at bedtime. (Tr. 475-76). In the same report, Dr. Barkley noted that 75 mg was McCommons's "maximum tolerable dose." (Tr. 476). Furthermore, no doctor opined that the side effects of the Topamax limited McCommons's ability to work in any way. In fact, McCommons had mentioned drowsiness at an appointment with Dr. Dizon prior to her alleged onset date, but was still working full-time despite her alleged drowsiness. (Tr. 353). Thus, the court finds substantial evidence supports the ALJ's decision not to incorporate any medication side effects into her RFC assessment.

### 3. The Adequacy of the ALJ's Hypotheticals

McCommons's final argument is that the ALJ's hypothetical questions to the VE did not fully account for her moderate difficulty in CPP. Courts in this Circuit have reached opposite conclusions on the question of whether an ALJ errs when she does not incorporate a moderate limitation in CPP into questions posed to the VE. For example, the court in *Green v. Comm'r of Soc. Sec.* held that so long as the ALJ has found a moderate limitation in mental functioning at Step Three, he must include that limitation, in some form, in the hypothetical questions posed to the VE. *See Green v. Comm'r of Soc. Sec.*, No. 08-11398, 2009 U.S. Dist. LEXIS 65355 at *29, (E.D. Mich. June 30, 2009) *adopted by* 2009 U.S. Dist. LEXIS 65349, 2009 WL 2365557 (E.D. Mich. July 28, 2009) (finding that "'moderate' concentration problems, even if not severe enough under the regulations to meet the listing . . . need to be included or accommodated in

some suitable fashion in the hypothetical question at Step 5"); *see also Bielat v. Comm'r of Soc. Sec.*, No. 02-70791, 2003 U.S. Dist. LEXIS 11722 at *31 (E.D. Mich. Jan. 29, 2003) *adopted by* 267 F. Supp. 2d 698 (E.D. Mich. 2003) (finding that once ALJ makes determination that claimant "often" has CPP deficiencies, "he must craft a hypothetical question which encompasses, in concrete terms, the substance of that finding"). This is so regardless of whether the ALJ included the limitation in his RFC assessment. *Green*, 2009 U.S. Dist. LEXIS 65355 at *18-19, *29 (moderate limitation in CPP, though not included in RFC assessment, still required to be included in hypothetical).

On the other hand, in *Latarte v. Comm'r of Soc. Sec.*, No. 08-13022, 2009 U.S. Dist. LEXIS 131437 (E.D. Mich. Feb. 24, 2009) *adopted by* 2009 U.S. Dist. LEXIS 33265, 2009 WL 1044836 (E.D. Mich. Apr. 20, 2009) the court found that the ALJ's hypothetical to the VE which included a limitation of simple, routine, and unskilled work sufficiently accounted for the claimant's moderate limitation in CPP because "[u]nskilled work, by definition, is limited to understanding, remembering and carrying out only simple instructions and requiring little, if any judgment." 2009 WL 1044836, at *3 (citing 20 C.F.R. § 404.1568(a)). Courts have found "there is no bright-line rule," rather the court "must look at the record as a whole and determine if substantial evidence supports the ALJ's decision." *Taylor v. Comm'r of Soc. Sec.*, No. 10-12519, 2011 U.S. Dist. LEXIS 77117 at *22, 2011 WL 2682682 (E.D. Mich. May 17, 2011) *adopted by* 2011 U.S. Dist. LEXIS 74293, 2011 WL 2682892 (E.D. Mich. July 11, 2011); *Hernandez v. Comm'r of Soc. Sec.*, No. 10-14364, 2011 U.S. Dist. LEXIS 108556, at *30, 2011 WL 4427225 (E.D. Mich. Aug. 30, 2011) *adopted by* 2011 U.S. Dist. LEXIS 108186, 2011 WL 4406346 (E.D. Mich. Sept. 22, 2011).

Here, the record as a whole supports the ALJ's determination. The ALJ, in her decision,

limited McCommons to routine, unskilled work "because of moderate deficiency in concentration, persistence and pace." (Tr. 18). Her hypothetical to the VE regarding jobs McCommons could perform, including her past relevant work, incorporated a limitation to unskilled work, which necessarily implies dealing with only simple instructions and using little judgment. (Tr. 41-42). Thus, the ALJ properly included the limitations she found credible into the hypothetical. *See Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993)(ALJ only required to pose hypotheticals including limitations she finds credible).

Furthermore, Dr. Tate, the only medical source to assess McCommons's mental RFC, and who assessed the moderate limitation in CPP, went on to find that McCommons was still capable of doing simple tasks, which again, are consistent with the "unskilled work" included in the ALJ's hypothetical. (Tr. 412, 414). And, McCommons' treating psychiatrist, Dr. Jamora, noted no concentration or memory problems in his treatment notes. (Tr. 341; 439). Therefore, the court finds that the ALJ properly accounted for McCommons's moderate CPP difficulty and remand on this point is not warranted.

## III.   CONCLUSION

For the foregoing reasons, it is RECOMMENDED that Defendant's motion for summary judgment [24] be GRANTED, that Plaintiff's motion for summary judgment [18] be DENIED, and that the Commissioner's findings be AFFIRMED.


Dated: March 13, 2012                          s/David R. Grand
Ann Arbor, Michigan                            DAVID R. GRAND
                                               United States Magistrate Judge

## **NOTICE**

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir.1991); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir.1981). The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir.1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir.1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

## **CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on March 13, 2012.

s/Felicia M. Moses
FELICIA M. MOSES
Case Manager

30